2024-1194, 1221, 1222, and 1223, Mr. Cahill. May it please the Court, my name is Ron Cahill, and I represent CAO Lighting, the plaintiff and appellant in this matter. CAO, and the inventor is Dr. Denson Chow, also spelled CAO. The patents at issue are directed to solving a problem that the lighting industry struggled with for years. How to replace traditional incandescent and fluorescent general-purpose light bulbs with light sources having high-powered semiconductor chips. This is discussed throughout our brief in the secondary indicia and in the background of the 961 patent. Getting right to the main issue. The main issue was public accessibility of this presentation and its deposit at the University of Wisconsin Library. Your Honor, there's a lot of mud thrown at the wall on this particular topic, but we think it boils down to a simple failure of evidence. The Board found that the Crames 2000 reference was publicly accessible because the title of the conference at which the paper was presented was cataloged in the library system. And the Board found, based on no evidence, that a person of ordinary skill in the art would be able to locate that title and then locate the Crames reference. Now, no expert talked about, right, the legal standard is a POSA must be able to find the reference through the exercise of reasonable diligence. No witness spoke to a POSA finding the Crames 2000 reference. Is public accessibility a question of law or fact? So it's a question of law that depends on a number of factual findings. And here, there's no evidence to support the Board's finding. No expert said it. No librarian said it. Now, this court in, for example, the Samsung case. Can I just clarify? So when you described what there was no evidence for, it seemed to me you combined two things as to one of which there was evidence. The one that there was evidence is the evidence from Ms. Waters, the Wisconsin science tech or tech science or something librarian, that said a person skilled artisan looking for the volume would find the volume in the catalog as of June 29, 2000. But then, so there is evidence that a skilled artisan could find the volume. Our law doesn't say, does it, that somebody has to know of the existence of subparts with titles to be able to search for them. The point, after all, is to find things that you don't already know existed. So what is it that you think that's legally necessary but missed? So the, I mean, the test is the POSA has to be able to find the Crames 2000 reference through the exercise of reasonable diligence. And the Crames article isn't cataloged. So how do we go about determining whether a POSA would find that exercise? But it seems to me possible that that test could mean there's an ambiguity, as I'm understanding it, about what it is that the relevant artisan has to be looking for. Is the relevant artisan, is the question whether, if a relevant artisan knows of the existence of a particular article, that that person could find it somewhere in public? I don't think that's the test. Well, I don't think it is either, Your Honor. In this case, the motivation to combine starts with the Begemann reference. And the Begemann reference purports to make one of these LED light bulbs, but says very little about the LEDs and doesn't provide the high-powered LED that Dr. Chow does. And so Cree and the board look at Begemann and say, well, someone reading Begemann would be motivated to go look for a light-emitting diode to use in that reference. And so that's what the person of ordinary skill in the art is doing. And then the question is, when they go look for that, would they be able to find the Crames 2000 reference through the exercise of reasonable diligence? And as I understand, the board said, well, somebody in that position would, in fact, be searching for things, volumes, like light-emitting diodes, research manufacturing, and applications. And having found that, the person would find what's inside that volume, which is right. And the board made that up. There is no evidence to support that. So this court has always required, when someone's looking for a reference, that the facts around reasonable diligence be determined. So, for example, in the Samsung case that's in our brief, there was a reference that was on a Listserv. And this court wanted to know, well, how many people received the Listserv? How difficult was it to get on the Listserv? Would a person of ordinary skill in the art in a particular field, would they join it? And remanded to determine those things. So this was a presentation at a conference with a lot of people. And there was a document produced that was distributed there, right? And then it was sent to the Wisconsin Library, where it was indexed by title. So there clearly was a there there. Well, Your Honor, I think that some of those facts aren't true. So something was presented at the conference. We don't know if it was the paper. It may have been a poster or an oral presentation. Dr. Levy said that the proceedings were disseminated to members, but he didn't say when. So the board didn't rely on it because there was no evidence as to when the papers were disseminated to members, or who the members were, or how many of them there were. Mr. Levy said he never said he received one. He never said he was a member. So we don't know any of that. What is cataloged is the title of the conference proceedings, which is Light Emitting Diodes, Research, Manufacturing, and Applications. Now, applying Samsung and Acceleration Bay, I think we would need to know, in order to find the Crames reference with reasonable diligence, well, what would that person of ordinary skill in the art be searching for? How many hits would they get? How much would they have to wade through to actually find the Crames 2000 reference? In the Acceleration Bay case, from this court, there was a website to which reports had been updated, and they were cataloged by author and year. This court was concerned that there was no evidence of what a person of ordinary skill in the art would find if they went looking for the asserted reference. There was some evidence that for the year, 1999, there were hundreds of references, and a person of ordinary skill in the art would have to look through all of those titles to find the relevant nugget. And this court said, that's not good enough. That's not reasonable diligence. Here, we don't have any evidence of what a person of ordinary skill in the art would look for and find if they searched the world for light emitting diodes. Would they have to go through 3,000 references to find this conference proceedings, and then Crames within it? That seems like on this court... Is it part of your argument, counsel, that you think, for example, the Ms. Waters declaration is inadequate? Because you're saying the board made certain things up, and I do feel like the board properly relied on the Ms. Waters declaration for part of what would be found by a POSA. Right. And we accept the Waters declaration that the University of Wisconsin received the conference proceedings and cataloged the title of the conference proceedings. That's not enough to find that Crames 2000 was publicly accessible. Right. At the board, we argued the Salesforce case, which relies on Samsung and Acceleration Bay, and the exact same facts here, the exact same facts. There was a conference proceeding that was cataloged, and there was no evidence that a person of ordinary skill in the art searching generally would locate the article that was within the conference proceedings based on only the conference proceedings being cataloged. It's identical to the facts here. And it went the other way. It wasn't publicly accessible. So the board said the difference between that and this is, well, here, a person of ordinary skill in the art would find the Crames 2000 reference based on the conference title. And they based that conclusion on no evidence. So no one said that except counsel. No expert said it. No librarian said it. You're not attacking the reference, but its availability. So there's a difference between being technically accessible and being publicly accessible. And this court's case law makes that distinction. We don't argue that it wasn't technically accessible. We argue that a person of ordinary skill in the art would not have been able to find it exercising reasonable diligence, and there's no evidence to support that he would. And that makes it not publicly accessible under this court's case law and under the case law at the board. I would like to pick up the claim construction issue, if I could move on to that. The claim is to a light source. And it includes all sorts of configuration of the light, configuration of the heat sinks, configuration of the LEDs, the actual layers within the LEDs. In some cases, which layer is on top of which other layer. That it's white light. And it also requires the critical claim limitation is a light emitting diode chip configured to output light at greater than about 40 milliwatts. The board said the claim does not require a chip that when placed in the bulb actually operates at more than about 40 milliwatts. And we think that's plainly wrong based on this court's case law. Using Parker Vision as an example, this court's held that an apparatus that is reasonably capable of performing the claimed functions without significant alterations falls within the claim. And what that means here, and the way this claim has always been treated, the way it was treated in the district court where the claim construction comes from, the way it was treated by the parties here, the way it was treated in the reexamination where the claims were allowed, is that the LED in the light bulb has to be capable of emitting 40 milliwatts. And that means there has to be a circuit that will provide it with enough drive current to do that. As you can see, you're into your rebuttal time. You can use it now or save it. I'll save it. Thank you. Mr. Alamani. Good morning. May it please the court. My name is John Alamani, here on behalf of Cree and Wolfspeed. I'll address the claims publication status briefly, and then I'll talk about the combination of Bigamon and claims. And I think that will help to resolve the issue regarding claim construction. And I'll address claim 41 if I have time. I would think you want to get to the public availability of the reference. And I'll start there. So, contrary to counsel's argument, the board had substantial evidence. So, as we argued in our briefing and below, the claims paper and the proceedings of the SPIE qualify under the Inouye Hall Blue Calypso line of cases, even without Dr. Levy's testimony. But his testimony further qualifies it under M&K Holdings, the other case we cited in our briefing. So, Inouye Hall says if you index it, it's likely available. That was indexed in the German Library. Blue Calypso adds that indexing by subject matter can be a helpful indicator that one of the skill net would be able to find it. So, here we have Ms. Waters' testimony that's undisputed. It says, as of 2000, before the critical date, the proceedings were in the index, and they were indexed by light-emitting diodes. Also in the title was the year 2000. And so, the board held that a person with skill in the art examining the proceedings would be able to find the article. So, the article is on page 2 of the proceedings. I'm not sure that matters, but the article is authored by Dr. Krams, who we all agree is a superstar in the field. The title of the article itself is High Brightness LEDs. So, one of the skill in the art in 2000 who had begumment, who was looking for an LED to fill in the holes of the begumment disclosure, would be looking for LEDs. They would find, if they looked in the index at the University of Wisconsin, the proceedings for SPIE, the very latest ones, or at least one in 2000, would be light-emitting diodes, design, analysis, etc. That would be a place to look. When they opened those up and looked at the table of contents, they would see a collection of LED articles, the first of which was authored by a superstar and his High Brightness LEDs. I think that, in and of itself, would qualify it as a publication under the Enray Hall and Blue Calypso cases, but the board went further. They also showed that it was publicly available, and one of ordinary skill, exercise, and reasonable diligence could find it under the rubric in M&K Holdings, or at least part of it. In the M&K Holdings case, what the court said was that if the site had prominence, it was about a website, but it said the site itself had prominence, so one of the skill merit would know to go to the initial webpage. The webpages themselves did not have a search capability, but the court found that a PC that had access to it could search the webpage itself, and they could start from the most recent meeting, and they could move their way backwards, navigating from the most recent to the oldest. Similarly here, we have Dr. Levy's testimony, on which the board relied. What Dr. Levy said, this is cited in Appendix 24 to 25, but they're citing his testimony at 10039 through 10040. What he said is, I was a person of skill in the art in 2000. This is 22 years before his testimony, but I was a person of skill in the art in 2000. I, along with other persons of skill in the art in the field of optoelectronics, attended these SPIE conferences. He further said, as CAO's counsel mentioned, that they were disseminated, and they were sent to libraries. The way we relied on that testimony is because it was also in the library, which helped to corroborate his testimony, make it more credible, but the board relied on all this testimony to find that one of the skill in the art would have been interested in those few proceedings. Dr. Levy said it has prominence under the M&K rubric. And so it had prominence. They would be looking for that. So in addition to the Henry Hall and Blue Calypso cases meeting that standard, I think we've met the further rubric that M&K sets out. Are there questions about that, Your Honors? I'll proceed. Okay. So what I'd like to do is move to the Begum and Crams combination. We briefed the construction of configured to and whether it means capable of. But I think for purposes of the board's findings in these combinations, it really doesn't matter. We set out in the petition argument that the claims were met under plain order meaning. Dr. Levy testified on that basis. Dr. Crams showed a physical embodiment. So I think whether it's configured to or the broader capable of, either way the board's findings hold. And so in the first set of findings that the board addressed, they found that our evidence was sufficient to establish that one of Oregon's scale would put the Crams chip in the Begum and Lamp. So no disembodied LED, not sitting by itself. The Crams chip in the LED lamp. They relied on Dr. Levy's testimony where he said one of the scale in the art would put that Crams chip in the Begum and Lamp. And he testified that Flame 21's limitation of more than 40 milliwatts would be rendered obvious because the Crams chip was capable of exceeding 40 milliwatts. It would go up to 170 milliwatts if driven at its ultimate drive current. Can you give me the J8 pages for that testimony you were just describing? Pardon me? Can you give me the appendix pages for that testimony? Sure. His testimony is at appendix 10047 through 10048. The board refers to this as appendix 13 through 14. So this is garden variety obviousness. They have the documents, they combine the documents, they rely on Dr. Levy, and then they say that Chow's experts are discredited or unpersuasive. The basis for that, this is appendix 15 through 16, and actually appendix 39 is probably the clearest. They say we find them unpersuasive because the hypothetical that Chow came up with or that CAO came up with is premised on the Crams chip being driven at 1.5 amperes, so at its maximum drive current, and also based on outputting 390 lumens, which is related to a 40-watt bulb in the proceedings. But the board found Levy was credible, CAO's experts were not. One of Skilner would have combined the two references. The board notes that what is relevant is that Crams discloses a single chip that has the capability of outputting more or less light, depending on the current that's applied to it. So that's the first finding. And then they went beyond that to a second finding. So I think you can affirm on that basis. But the board also found, this is appendix 41 through 43, so the second set of analysis they put together, where they said that Crams chips could and would be installed in the lamp, into Begemann's lamp, based on explicit disclosures in Begemann, and then based on Dr. Crams' testimony about how one would actually do that. Again, that's in appendix 42 where they credit Dr. Crams' testimony. And so they concluded, appendix 43, that one of Skilner, on that basis, would also have found this obvious. And I'll note when they made that finding, and this is in the middle, about appendix 40, they noted that CAO's own witnesses testified regarding how one would understand the Crams reference. So the board was looking at how would one of Skilner actually understand the Crams reference. Would they think that you want to drive it at the highest possible drive current? And they said patent owner's witness, Mr. York, testified that the practical drive current for the Crams chip, so the way one of Skilner would read that reference, was that it would be driven somewhere around 350 milliamps. So based on either one of those two combinations, the claim is invalid, is obvious, based on any construction that the term could figure to. Before you turn to the next issue, can I ask you to at least go back to the public accessibility issue and tell me your thoughts on two cases that were cited by opposing counsel, Acceleration Bay and Salesforce. The Salesforce case? Salesforce and Acceleration Bay. The Salesforce one I think is easier of the two. So the board, that's a board case, not a presidential, it's not a federal circuit case. But what the board found there is that you had the title of proceedings, so you had proceedings similar to here, except the title of it was the Society of International Computing. So very broad. The actual subject matter of the content, this is at appendix 26 through 27 of the final written decision, the claims related to, I don't know what this means, but a message gateway and content reformatted in a vectorized format. And what the board found, I think reasonably, is that if you had a claim to vectorized format, going off and searching for computing wouldn't do anything. That doesn't make sense. It wouldn't lead you to the reference. As opposed to in our case, where someone is, with Begum, is specifically looking for an LED. And so the subject matter in the proceedings, the title of the proceedings itself is LED. And so it's different on that. I think for the Acceleration Bay case... As you pointed out, the board case is not presidential. Yeah, it's not. It's not presidential anywhere, even at the board. And then the second case is Acceleration Bay. And the Acceleration Bay case, and I think CAO's counsel alluded to this, was about having to skim thousands and thousands of pages so there was no argument made at the board about the number of volumes or any of that. What the board did find, though, was that, and I think this aligns with M&K Holdings as opposed to Acceleration Bay, is that if you were looking at the reference starting from the newest, the most recent proceedings, and the title includes 2000, then like M&K Holdings, it would be obvious, or it would be reasonable for a person with skill in the art exercising reasonable diligence to start at the latest one and move backwards. Did the board rely on the fact that this reference had basically the date of yesterday on it and that if you're in a fast-moving field, you're probably going to look at the most recent stuff? They did. Did the board say anything like that? They did. They said that it would be reasonable for them to look, and I don't have the exact site to it here, but they said it would be reasonable to look at the most recent proceedings. So, yes.  Okay. Do you want to mention your cost appeal briefly? Sure. So as to Claim 41, Limitations Flat or Substantially Flat Side, I think for purposes of this argument, the main error that the board committed here was not looking at all the evidence. So we cited M. Ray Warsaw Orthopedic, which says that the panel must, or the board must, consider all the prior art in its entirety. There's another case, Belden v. BurkTech, 805 F. 3rd, 1054. We didn't cite this, but it says a reference must be considered for everything it teaches. So where the board erred here is in not considering the unrebutted testimony of Dr. Levy and additional disclosures in Allen beyond Figure 6B that we refer to in our reply briefing below, which included a statement about, so Dr. Levy testified both that Figure 6B shows the flat side. So he said one skill in the art at the time, in 2000, would have considered the sides of Allen to be flat. That's unrebutted. There's no testimony on the other side. He wasn't opposed about it. And then the Allen reference talks about a lamp housing may be manufactured so as to appear in any standard configuration, such as an ordinary R-type lamp configuration, which looks like a flood lamp, essentially. So the end of it is flattened. It looks like a cone or a space capsule. So the end of it's flattened. There's nothing in the record that suggests that the board looked at that. So CAO cited a part of the board's decision where they did cite to Figure 6B, which is part of our argument, and they discounted that. Can I just ask, do I remember right? You did not present that figure. It was a 3B. Is that the figure that you're now relying on? You did not hand it to the board and say, look, if you want to know what's substantially flat, it looks like this. Not in that way, Your Honor, but we did present it in our reply brief. We cited to that specific statement in our reply brief. There's a little argument in the briefing about the fact that there's a typo, that it says Figure 2. But if you look at the reference, Figure 2 is a circuit board. But we relied on that statement about that lamp. There could be any standard configuration, including that flood lamp. So it is properly there. CAO filed motions to exclude before the board, but not to exclude that evidence. And they didn't object to that as not having been raised in the petition. Beyond that, the law requires that the board view the reference in its entirety. And so from that standpoint as well, we feel like to the extent that they were going to – well, I don't know what they did with Dr. Levy's testimony. It doesn't appear that they considered it. But if they were going to reject that, they should have had the duty to – or should have looked at the reference in its entirety and didn't do so. At least there's no indication. There are other places in the decision CAO actually raises where the board talks about the fact that it did – that there was no competing evidence. So when they talk about the Crams publication, Appendix 25, they say there's no evidence of record that suggests Crams is not a printed publication. So they know that they have a duty to look at the entire record. But in the case of this claim, there's no indication at all that they looked at that. So for those reasons, we believe that that – actually believe you could reverse that based on the unrebutted record, but at least vacate and remand that. Counsel, if you intended to rely on Figure 3B, add on Figure 3B before the board, why was it omitted in the sentence that was quoted? I'm sorry. I didn't understand. I mean, I think that there was maybe some confusion. There's Figure 2 versus a Figure 3B. If the intention was to rely on Figure 3B in the sentence that was quoted, why wasn't Figure 3B identified? So our intention was to rely on Figure 6B to begin with, and we had expert testimony to back that up. But as the board seemed to be grappling with narrowing the definition of the term, we addressed that in a briefing, but I don't want to go down the hole. But as they started talking about how they were narrowing, looking at it a different way, particularly the oral argument, we were relying on the fact that the Allen disclosure is much more complete than what's said in the CAO patent. And so maybe in retrospect, with the three-dimensional claim, it would have been better to start there, but that's not what we did. But I think it's fairly before the board in any event based on the disclosure in Allen, and I think they have a duty to look at it in any event. And I realize my time has expired. Your time has. I'm going to give you a minute to rebuttal on the cross-appeal if there's something to rebut. Understood. Thank you, Your Honor. Mr. Cahill. Thank you, Your Honors. One thing I'd like to address is on the issue of publicly available. You know, counsel suggested a person of ordinary skill in the art would look at the most recent proceedings. Counsel suggested that websites organize things by the most recent proceedings. The conference websites do. None of that is in the record here. None of it. Your opponent mentioned reliance on, was it Dr. Levy's testimony? Dr. Levy didn't say that. Well, first of all, the record that we're talking about is at the University of Wisconsin library. It's not the conference proceeding website. It's indexed by title, author, the date recorded, and that's what's indexed. So there isn't here are the most recent conference proceedings. You're just searching that index. And Levy doesn't say anything different. I'm sorry, but just the conference proceedings, the catalog entry says 2000. We're talking about basically six months before the priority date. Somebody in the field of LEDs, I mean, did the board say anything to the effect what seems kind of intuitive? Is that if you want to see what the most recent advances are, maybe work backwards from, I think, a known technical society. Well, there's no evidence of that in our record. The board didn't say we would start with the most recent. There's a different federal circuit case where that was the case. There's no evidence of that here. And also, we don't know, Acceleration Bay came up again. Was it Acceleration Bay? Where there were potentially hundreds of titles to look through. Counsel suggested thousands of pages. There were hundreds of titles, and that was too much. And he said, there's no evidence below how many pages someone would run into doing this. And that's exactly the problem. In this court's Samsung case, it said you need to know that stuff. If a person of ordinary skill in the art goes and searches for LEDs, how many hits are they going to get? Are they going to get a million? Are they going to get 3,000? This well-known conference, its proceedings numbered 3,938 as of 2000. How many hits do you get searching for light-emitting diodes? None of that's in the record, so we don't know what reasonable diligence is. Thank you, counsel. We have your argument. And since there was nothing in the cross appeal, there's no further response. The case is submitted.